## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| TRESA M. MEIS, ) | |
| ) | |
| Plaintiff, ) | **CIVIL ACTION** |
| ) | |
| v. ) | **No. 04-2201-KHV** |
| ) | |
| MYRON'S DENTAL LABORATORIES, INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## MEMORANDUM AND ORDER

Tresa M. Meis filed suit against her former employer, Myron's Dental Laboratories, Inc., for sexual harassment and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.*  This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #62) filed April 6, 2005.  For reasons stated below, the Court overrules defendant's motion.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material

fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

## **Factual Background**

For purposes of defendant's motion for summary judgment, the following facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff.[1]

---

[1]     The Court has included only those facts which are relevant to the discussion of defendant's
(continued...)

Myron's Dental Laboratories, Inc. ("Myron's") operates a dental lab in Kansas City, Kansas. It produces dental prosthetics (including dentures) based upon prescription orders from dentists. The dental lab is on the middle floor of a three-floor building. The administrative offices and reception area are on the top floor. Tim Sigler, Myron's primary owner, and Tom Cooney, Chief Financial Officer and Human Resources Manager, have offices on the top floor. Sigler makes all final decisions on hiring, firing and discipline of employees.

In April of 1999, defendant hired plaintiff. Her job involved data entry, processing dental orders, disinfecting dental trays and molds, and giving the trays to dental technicians in the lab.

Mike Harper has worked at Myron's for more than 26 years. Harper supervises other employees in the dentures lab and he refers to himself as a supervisor. Harper's personnel file reflects that he is a supervisor and when plaintiff was employed at Myron's, Harper wore a smock which said that he was a supervisor. Harper has no authority to hire, fire, discipline or evaluate employees, but he can recommend termination of employees and he provides input in employee evaluations.

Harper's Contact With Plaintiff

Harper's work station was approximately 80 feet away from plaintiff's work station at the opposite end of the dental lab. Approximately seven dental technicians worked between plaintiff and Harper in an open area. Harper frequently called plaintiff a bitch or fucking bitch while they were at their work stations. Plaintiff occasionally heard Harper use her name, but he usually referred to her only as fucking bitch. Except Wanda Enyard, a dental technician, no witness ever heard Harper call plaintiff a fucking bitch when

_____

[1](...continued)
motion for summary judgment.

plaintiff was present.  Enyard, however, stated that Harper once called plaintiff a fucking bitch when plaintiff turned away from Harper.[2]  Harper admits calling plaintiff a bitch, but claims that he only did so behind her back.

Plaintiff told Shirley Pavlovich, a co-worker, on a dozen occasions that Harper would simulate oral sex with his fingers and tongue.  At different times, plaintiff also told Pavlovich that Harper commented about plaintiff's breasts and called her a bitch.  Plaintiff was often crying when she told Pavlovich of these incidents.  On numerous occasions "for months and months and months," plaintiff told Pavlovich of the sexual harassment by Harper.  Up until her discharge in September of 2003, plaintiff complained to Pavlovich that Harper commented on her breasts and called her a bitch.

Before June of 2002, Harper made comments to plaintiff about blow jobs, asked her for oral sex and simulated oral sex with his tongue and fingers.  Before June of 2002, Harper told Christine Reyes that "your friend [plaintiff] is a fucking bitch."[3]  Plaintiff was not present when Harper made this comment, but Reyes told plaintiff about it.  Between May and August of 2002, plaintiff told Reyes that she was going to buy a name tag that read "fucking bitch" because that is what Harper called her.

In early 2003, Harper again told Reyes that "your friend [plaintiff] is a bitch," or, "fucking bitch."  Plaintiff was not present when Harper made the comment, but Reyes told plaintiff about it in May or June

---

[2]       Plaintiff testified that Rose Wallace, Keri Williams and Marsha Taylor would have heard Harper's comments near her workstation and that Ricky Clayton and Richard Bellman would have heard Harper's comments near Harper's workstation.  Plaintiff testified that Wallace witnessed Harper's harassment, but Wallace testified that she never heard Harper call plaintiff names or engage in harassing behavior.

[3]       Christine Reyes was the receptionist.  She worked just outside the offices of Sigler and Cooney.  Reyes was a close friend with plaintiff and they went to lunch together most of the time.

of 2003.  Reyes did not report Harper's comments to members of management.

Harper touched plaintiff's buttocks on several occasions in late June of 2003, in March of 2003 and in the fall of 2002, among other times.  In July of 2003, Harper went to plaintiff's work station and started to rub her shoulders.  He told plaintiff how much he missed her.  Plaintiff told Harper not to touch her and to go away.  On July 28, 2003, Harper again called plaintiff a fucking bitch.  Plaintiff told Harper that she did not appreciate being called that, that Harper had continuously called her a fucking bitch and that she had continuously asked him to stop.

Workplace Environment And Sexual Comments

At least two employees testified that they tried to avoid Harper because of his sexual comments. Nola Zarate tried to avoid Harper because she believed that when he complimented her, it had a sexual connotation.  Likewise, Jill Hinton tried to avoid going to the lab area because Harper made sexual comments to her in 2002 and 2003.  On one occasion in the employee break room, Harper showed Hinton a magazine picture of a female wearing lingerie and said "You would look good in this.  I would like to see you in it."  On another occasion near that same time, Harper commented to Hinton that he was jealous of her husband and that her husband was a lucky man to be going to bed with her every night.  Other employees also told Hinton that Harper made comments about her breasts and buttocks.

Harper admits that at the workplace, he used the word bitch.  Harper talked openly at work about blow jobs and the fact that his wife did not perform oral sex.  On two or three occasions before September of 2003, Harper made a comment about blow jobs to a female employee as she was eating a banana at her work station.  One employee testified that Harper talking about blow jobs "was just Harper" and that "he let it be known he doesn't get that kind of stuff at home."

Sometime in 2002 or 2003, plaintiff gave David "Ricky" Clayton a sack at work and told him that it was a gift for fixing her father's dentures. When Clayton opened the sack, he found what appeared to be a marijuana joint wrapped in sexually explicit wrapping paper.[4]

On July 24, 2003, Harper walked up to Shirley Pavlovich at the workplace, grabbed her, bent her over and gave her a kiss on the lips without her consent. Pavlovich did not complain, but she was bothered by the incident and thought that it was offensive. Immediately after Harper kissed Pavlovich, another female employee asked Harper to kiss her too and he did so. No employee complained to management about these incidents.

On July 31, 2003, at an employee lunch, Harper was standing behind Brenda Davidson in the food line and grabbed her buttocks. Reyes then got in line between Harper and Davidson. Harper grabbed the right breast of Reyes, let go, and then grabbed and squeezed her right breast for about three seconds.

<u>Myron's Sexual Harassment Policy</u>

Myron's maintained a written policy against sexual harassment which it included in its employee policy manual. Each employee received a copy of the manual. In 1999, plaintiff read and understood Myron's policies on non-discrimination and harassment including the procedures for reporting and investigating complaints.

---

[4]     At her deposition, plaintiff initially denied that she took marijuana to the workplace. She then invoked her Fifth Amendment privilege when asked who she gave marijuana to at Myron's. Enyard also invoked her Fifth Amendment privilege when asked about plaintiff's use of marijuana in the workplace. Plaintiff later admitted that she had purchased marijuana with Reyes and Enyard, but she denied distributing it in the workplace. Defendant argues that once taking the Fifth Amendment, plaintiff cannot now waive the privilege in an attempt to show that she did not distribute marijuana in the workplace. Defendant has not shown how plaintiff's use of marijuana is relevant to its motion for summary judgment. The Court therefore need not address defendant's argument at this time.

In 1998 or 2000, defendant placed posters about sexual harassment in the workplace. The posters (in bright red) were maintained in open view on the middle and top floors. They stated that "SEXUAL HARASSMENT IS ILLEGAL," that there could not be "RETALIATION FOR COMPLAINING ABOUT SEXUAL HARASSMENT," and that if an employee experienced or witnessed sexual harassment, he or she should report it immediately to a supervisor or the Human Resources ("HR") manager. Harper was considered a supervisor to whom an individual could complain.

From 1998 until 2000, Michela Lauver worked as defendant's HR Manager. Lauver did not provide any seminars on sexual harassment. During Lauver's employment, defendant's sexual harassment training consisted of allowing new employees to peruse the handbook and having Lauver discuss sexual harassment with them for up to one minute. On at least five occasions, Lauver discussed with Sigler the need for sexual harassment training. Lauver wanted to educate employees on sexual harassment, but Sigler did not want to do so because he feared a flood of complaints.

<u>Plaintiff's Complaints Through June of 2002</u>

Defendant's policy stated that employees who were subject to harassment or who had information relating to harassment should report the conduct to their supervisors, the HR manager or any owner.[5] Plaintiff complained to Marsha Taylor, who was her supervisor and the dental lab manager, at least once a week about Harper's behavior.

On a few occasions, plaintiff told Lauver that Harper had made sexual comments – including comments about plaintiff's breasts and buttocks and asking for blow jobs. Lauver testified that when Sigler

---

[5]        Plaintiff understood that Cooney was the equivalent of the HR manager.

learned of these allegations, he did nothing in response.[6]  Lauver told Sigler on at least two occasions that plaintiff had complained of inappropriate conduct by Harper, but Sigler seemed irritated by the complaints.

In June of 2002, plaintiff told Sigler that Harper called her a fucking bitch, that he asked her for blow jobs, that he was sexually harassing her, that he had touched her and that he slammed pans and used profanity in her presence.[7]  Plaintiff testified that she probably used vulgar words when she met with Sigler, but he did not discipline her.[8]  Sigler gave Harper a written warning for using profanity in the workplace, but he did not require Harper to attend training or counseling.  Harper's harassing conduct stopped for two or three months after plaintiff complained in June of 2002.

On or about June 26, 2002, plaintiff met with Sigler and told him that she was upset because Harper had not received harsher discipline.  Sigler offered plaintiff a job in another area at the same pay, but she declined.  Sigler asked Harper and plaintiff to stay away from each other except for dental related matters.  Sigler also told plaintiff that she was more replaceable than Harper, that he would not fire Harper and that if she continued to complain, he would have to let her go.

Between May and August of 2002, plaintiff told Reyes that Harper commented about her breasts and called her a fucking bitch.  Plaintiff told Reyes that Sigler told her not to complain about Harper.

---

[6]	Lauver testified that Sigler made sexually explicit comments at the workplace and would use words such as "tits."  Lauver testified that Sigler acted as if there were no rules with regard to sexual harassment.  On one occasion, Sigler showed Lauver pictures of women and their breasts and asked her if the breasts were real.  In addition, in 1999, another former female employee alleged that Sigler repeatedly made sexually suggestive comments and showed her photographs of nude and partially nude women.

[7]	Pans are trays which contain dental orders.

[8]	Sigler admits that plaintiff complained to him about Harper before June of 2002.  Sigler contends, however, plaintiff was upset because Harper was frustrated when she distributed work for the lab.

<u>Plaintiff's Complaint In August of 2003 And Subsequent Termination Of Employment</u>

On August 11, 2003, plaintiff told Cooney that Harper was calling her a fucking bitch, that she felt that she had endured a hostile work environment since June of 2002 and that she had filed a sexual harassment complaint with the EEOC.[9]  Between August 11 and August 29, 2003, Myron's did not investigate plaintiff's complaints about Harper.  After Sigler learned that plaintiff had contacted the EEOC, he told Cooney "if she went, she went, and we'll just have to, you know, deal with it when we get the letter."

On August 13, 2003, based on an employee incident between Harper, Reyes and Davidson on July 31, 2003, defendant suspended Harper without pay for one week and required him to attend and pay for employment behavior counseling.[10]  After Harper was suspended, he did not engage in further hostility or advances toward plaintiff.  Harper admits that the action plan which he received on account of the incident with Reyes was warranted, because he needed help with anger management and sexual harassment.  In particular, Harper testified that before his discipline in August of 2003, he was not aware what constituted sexual harassment or specific rules against sexual harassment.

On August 13, 2003, plaintiff did not report to work.  Plaintiff informed defendant that she had a

---

[9]      On August 28, 2003, plaintiff told Cooney about two additional complaints: (1) on August 27, 2003, she found a spider in a box and thought someone put it there; and (2) Mandy Wrigley made a gesture of slamming her fist into her hand.  Cooney could not find any witnesses to the spider incident.  One witness saw Wrigley hit her fist into her hand and Cooney instructed Wrigley not to make such gestures again.

[10]     Reyes, Davidson and Harper had different versions of exactly what happened on July 31, 2003.  Cooney and Sigler concluded that Harper touched Reyes' breast.  During the investigation, defendant also concluded that Reyes made an inappropriate sexual comment and that she had sent a pornographic photograph to another employee on the internet at work.  Reyes was not disciplined, but defendant required her to attend employment behavior counseling.

doctor's excuse and would not be in the rest of the week.  On August 18, 2003, plaintiff told Cooney that she would be missing work periodically to attend counseling sessions.  The following day, on August 19, 2003, Cooney gave plaintiff medical leave forms for her to complete so he could approve intermittent leaves of absence.  At that time, plaintiff told Cooney she knew that Harper had been suspended and sent to counseling.  That same day, Taylor counseled plaintiff about attendance issues.[11]

On August 27, 2003, plaintiff gave Cooney incomplete leave of absence forms.  When Cooney asked her to have them completed, plaintiff said that she was not willing to sign a release required by the health care provider.  On August 29, 2003, plaintiff asked Cooney for another medical leave form.  Plaintiff also told Cooney that Harper continued to use profane language even after he had been disciplined in June of 2002.  As an example, plaintiff stated that Harper had used profane language in front of her about four months earlier and that Neil Shemwell witnessed the incident.  That same day, Cooney interviewed Shemwell, but Shemwell denied that he had observed such an incident in the previous six months.

On August 29 or September 3, 2003, plaintiff told Cooney that she did not want to work at Myron's.  On Friday, September 5, 2003, plaintiff left work early to attend a counseling appointment.  Before she left, plaintiff told Taylor that she had to leave early for a counseling session which Cooney had authorized.  On September 8, 2003, Taylor met with plaintiff to express her concerns that plaintiff left early on September 5 without telling her and that plaintiff left "rush" cases which had not been processed.  Plaintiff admitted that she left two cases unprocessed, but plaintiff claims that they were not rush cases.

On September 8, 2003, Taylor and Cooney met to discuss plaintiff's performance in a closed door

---

[11]     This was the first time that defendant had counseled plaintiff on attendance issues.  Beginning in March of 2003, plaintiff had difficulty getting to work on time because of difficulty sleeping.

meeting in Cooney's office.  During the meeting, plaintiff knocked on the door and Taylor let her into the office.  Cooney thought that plaintiff's interruption of the meeting was inappropriate and constituted insubordination, but he never told plaintiff of his opinion.

On September 9, 2003, Sigler and Cooney met with plaintiff.  Plaintiff told Cooney that she was not happy working at Myron's because it was not protecting her from harassment.[12]  In the meeting, defendant offered plaintiff a severance package of four weeks pay and payment of COBRA insurance premiums for 18 months in exchange for her resignation.  The package was not an attempt to resolve plaintiff's threatened EEOC complaint and defendant's offer did not include a requirement that plaintiff drop any potential EEOC complaint.[13]  Plaintiff asked for some time to think about the severance package, but she rejected it the next morning.

Later, on September 10, 2003, Sigler and Cooney met with plaintiff and informed her that Myron's was terminating her employment.  At the meeting, plaintiff said "I guess you are firing me for the EEOC reason."  Prior to the termination, Sigler knew that plaintiff had said that she filed an EEOC claim.  Sigler, who made the decision to terminate plaintiff's employment, testified that he did so because plaintiff did not want to work at Myron's.[14]

_____

[12]     Before September of 2003, Myron's had not provided any formal training to employees on sexual harassment.  Zarate, who has worked for defendant some 20 years, testified that before defendant provided training in September of 2003, she did not realize that she had an obligation to report sexual harassment.  Other than a class in January of 2004, Cooney (the HR manager) cannot recall attending any seminars about sexual harassment.

[13]     Cooney is unaware of any other employees being offered a severance package during his tenure as HR Manager.  Sigler acknowledged that it was "unusual" to offer a severance package.

[14]     At the meeting, Cooney also mentioned that (1) the way plaintiff had handled her job made
(continued...)

<u>Reyes' EEOC Charge</u>

Reyes filed an EEOC charge in October of 2003.  Reyes alleged that Harper grabbed her breasts twice and that on two occasions (including in March of 2003), he told her that she looked so good that he could eat her.  The EEOC issued a no cause finding.  Reyes believed that after the company provided training in 2003, it had done all it could to prevent sexual harassment from recurring.

<u>Plaintiff's EEOC Charge</u>

On November 14, 2003, plaintiff filed an EEOC charge.  In her EEOC interview, plaintiff said that for the most part, Harper's conduct toward her between September of 2002 and September of 2003 was non-sexual and that, at any rate, witnesses would be unlikely to corroborate her allegations.  Plaintiff also stated that between June of 2002 and August of 2003, she did not complain about Harper to Sigler or Cooney.  Plaintiff stated that she "stayed silent for over a year."  Plaintiff told the EEOC investigator that for the year ending with her discharge, Harper rarely engaged in sexual advances.  Harper was mainly hostile to plaintiff because she got him in trouble in June of 2002.  On the EEOC Questionnaire, plaintiff stated that the alleged harassment was not so intimidating, hostile, or offensive that it interfered with her job performance.

<u>Procedural History</u>

On May 10, 2004, plaintiff filed suit against Myron's, alleging that it (1) maintained a hostile or abusive work environment based on sex and (2) because she complained of sexual harassment, terminated her employment.  Myron's seeks summary judgment on both claims.

---

[14](...continued)
it difficult for others to communicate with her; (2) she had allowed priority cases to sit; and (3) she had a disruptive attitude like when she interrupted the meeting between Cooney and Taylor.

<u>Analysis</u>

**I.      Hostile Work Environment**

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a "hostile or abusive work environment." <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 66 (1986). To establish a prima facie case of hostile work environment under Title VII, plaintiff must show that (1) she is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer. <u>Brandau v. State of Kansas</u>, 968 F. Supp. 1416 (D. Kan. 1997).

To prevail under a hostile work environment theory, plaintiff must show that sexually-oriented conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment. <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993). The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id.</u>; <u>see</u> <u>also</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998). The Court evaluates these factors from both a subjective and an objective viewpoint. <u>Harris</u>, 510 U.S. at 21. The Court must consider not only the effect the discriminatory conduct actually had on

plaintiff, but also the impact it likely would have had on a reasonable employee in plaintiff's position.  <u>See</u>

<u>Davis v. United States Postal Serv.</u>, 142 F.3d 1334, 1341 (10th Cir. 1998).

Defendant asserts that it is entitled to summary judgment because plaintiff has not shown that the

conduct was because of sex, that the alleged harassment was sufficiently severe or pervasive to create an

abusive working environment, that liability can properly be imputed to defendant or that any harassment

occurred within 300 days of plaintiff's EEOC charge.

A.     <u>Unwelcome Conduct</u>

Defendant contends that plaintiff did not consider the conduct offensive and unwelcome.  To

constitute harassment, the conduct must be unwelcome in the sense that the employee did not solicit or

incite it, and in the sense that the employee regarded the conduct as undesirable or offensive.  <u>Bales v.</u>

<u>Wal-Mart Stores, Inc.</u>, 143 F.3d 1103, 1108 (8th Cir. 1998).  The question is whether under the totality

of the circumstances plaintiff indicated by her conduct that the alleged harassment was unwelcome.

<u>Meritor</u>, 477 U.S. at 69; <u>see</u> <u>Quick v. Donaldson Co.</u>, 90 F.3d 1372, 1378 (8th Cir. 1996) (context is

relevant, and may include such things as plaintiff's sexually provocative speech)

Plaintiff admits using vulgar or profane language in complaining to Sigler about Harper.  In addition,

Reyes stated that she did not believe that plaintiff was offended by profanity in the workplace and that

plaintiff herself used strong profanity, including sexual references.  The fact that plaintiff may have used

profanity with other workers, and even used strong sexual references with others, does not establish as a

matter of law that plaintiff welcomed sexually offensive language and conduct by Harper.  <u>See</u> <u>Dobrich v.</u>

<u>Gen. Dynamics Corp.</u>, 106 F. Supp.2d 386, 391 (D. Conn. 2000) (though plaintiff was "no shrinking

violet" and sometimes used foul language at job, she did not waive protections against unwelcome sexual

harassment); see also Burns v. McGregor Elec. Indus., Inc., 989 F.2d 959, 963 (8th Cir. 1993) (use of foul language or sexual innuendo in consensual setting does not waive legal protections against unwelcome harassment). Plaintiff also presented her affidavit which states that she did not discuss sexual matters at work. In sum, plaintiff has presented sufficient evidence for a reasonable jury to find that Harper's conduct, summarized below, was unwelcome.[15]

B.      Hostile Or Abusive Environment

Whether a work environment is hostile or abusive is disjunctive, "requiring that the harassing conduct be sufficiently pervasive or sufficiently severe to alter the terms, conditions, or privileges of [p]laintiff's employment." See Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir. 1997). The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact. O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1098 (10th Cir. 1999). Isolated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct. Northwest Fin., 129 F.3d at 1414; see Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1175 (10th Cir. 1996) (one isolated comment and use of term "girlie" not constitute pervasive harassment).

Defendant first argues that in her EEOC questionnaire, plaintiff admitted that the harassment was not severe or pervasive. In response to the question "Do you believe that because of your . . . sex . . . you were subjected to a condition which was so intimidating, hostile, or offensive that it interfered with your job performance?," plaintiff responded "no." Plaintiff's response does not establish as a matter of law, however, that her work environment was not hostile or abusive. The law does not require plaintiff to show

---

[15]      Because the Court finds in favor of plaintiff on this issue, the Court need not address plaintiff's argument that evidence of sexual conversations with co-workers is inadmissible under Rule 412 of the Federal Rules of Evidence.

that the abusive work environment tangibly impaired her work performance.  See Harris, 510 U.S. at 21;

see also Davis, 142 F.3d at 1341 (trial court erroneously concluded as matter of law that plaintiff who is

successful in job cannot subjectively perceive work environment as abusive).  The Court therefore

overrules defendant's motion on this issue.

Defendant next argues that the alleged harassment did not occur because plaintiff is the only witness

to conduct which primarily occurred in open view of others.  Given the number of employees who state

that they did not witness harassing conduct, plaintiff faces a difficult burden at trial.  On the other hand,

several employees and former employees have partially corroborated plaintiff's version of events.

Plaintiff's evidence of a hostile work environment is that

1.   Harper frequently called her a bitch or fucking bitch while they were at their work
     stations.  Harper called plaintiff a fucking bitch when he talked to others about
     plaintiff.  Harper admits calling plaintiff a bitch, but claims that he only did so
     behind her back.

2.   Harper talked openly at work about blow jobs and the fact that his wife did not
     perform oral sex.  Before June of 2002, Harper made comments to plaintiff about
     blow jobs, asked her for oral sex and simulated oral sex with his tongue and
     fingers.

3.   Harper commented about plaintiff's breasts and buttocks.  Plaintiff complained to
     Pavlovich about Harper's comments about breasts and calling her a bitch up until
     she was discharged in September of 2003.

4.   Harper touched plaintiff's buttocks on several occasions (including in late June of
     2003, in March of 2003 and in the fall of 2002).

5.   In July of 2003, Harper went to plaintiff's work station and started to rub her
     shoulders.  He told plaintiff how much he missed her.  Plaintiff told Harper not to
     touch her and to go away.

6.   On July 28, 2003, Harper again called plaintiff a fucking bitch.  Plaintiff told
     Harper that she did not appreciate being called that, that Harper had continuously

called her a fucking bitch and that she had continuously asked him to stop.

7.   Harper admits that his discipline in August of 2003 was warranted because he needed help with anger management and sexual harassment. In particular, Harper testified that before counseling, he was not aware what constituted sexual harassment or the specific rules against such harassment.

On a motion for summary judgment, the Court cannot weigh the evidence and determine witness credibility. A reasonable jury could find from the facts set forth above, taken as a whole, that plaintiff suffered sexual harassment which was sufficiently pervasive to create an objectively hostile work environment. See Cadena v. Pacesetter Corp., 18 F. Supp.2d 1220 (D. Kan. 1998) (inappropriate sexual comments by supervisor, two of which were repeated on numerous occasions over period of months, not isolated comments and could support jury finding of pervasive harassment), aff'd, 224 F.3d 1203 (10th Cir. 2000). The Court therefore overrules defendant's motion on this issue.

C.   Employer Liability - Negligence

Defendant argues that as a matter of law, plaintiff cannot show that it negligently responded to a hostile work environment. Under Title VII, an employer may be held liable for hostile work environment sexual harassment committed by one employee against another if the employer negligently or recklessly fails to respond to the harassment. See Hirschfeld v. N.M. Corr. Dep't, 916 F.2d 572, 577 (10th Cir. 1990). This liability attaches when a plaintiff establishes that an employer had actual or constructive notice of the hostile work environment and failed to respond adequately to that notice. Davis, 142 F.3d at 1342. For purposes of Title VII, an employer is deemed to be on notice of a hostile work environment if management level employees know about the alleged harassment. See Hirschfeld, 916 F.2d at 577. A fact finder may infer that an employer had constructive knowledge of sexual harassment based on the pervasiveness of the

harassment.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 673 (10th Cir. 1998); see also Baker

v. Weyerhaeuser Co., 903 F.2d 1342, 1346 (10th Cir. 1990).

Defendant argues that other than plaintiff's complaint in June of 2002, plaintiff has not shown that

it was on notice of any harassment by Harper.  Plaintiff has produced sparse evidence that she complained

to management about Harper, but a fact finder could reasonably find that  management had constructive

knowledge of sexual harassment based on the pervasiveness of Harper's comments to plaintiff and other

employees; plaintiff's continued complaints to Taylor, the dental lab manager, and other employees; and

the fact that in June of 2002, Sigler told plaintiff that she was more replaceable than Harper, that he would

not fire Harper and that if she continued to complain, he would have to let her go.  Also, based on the

minimal discipline which Harper received in June of 2002 and Harper's admission that as of August of

2003 (more than one year after plaintiff complained to Sigler about sexual harassment), he was not aware

what constituted sexual harassment or the specific rules against such harassment, a jury could reasonably

find that management failed to respond adequately to that notice.  The Court overrules defendant's motion

for summary judgment on plaintiff's sexual harassment claim based on negligence.

D.    Employer Liability - Vicarious Liability

Defendant argues that as a matter of law, Harper is not a "supervisor" for purposes of vicarious

liability.  An employer is subject to vicarious liability for an actionable hostile environment created by "a

supervisor with immediate (or successively higher) authority over the employee."  Faragher, 524 U.S. at

807; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).  Plaintiff has presented evidence that

Harper supervised employees in the dentures lab, that he referred to himself as a supervisor, that his

personnel file reflects that he was a supervisor, that he wore a smock which said that he was a supervisor,

that he could recommend termination of employees and provide input in employee evaluations, and that

he was considered a supervisor to whom an individual could complain under defendant's sexual harassment

policy.  Though Harper may not have had direct authority over plaintiff, a reasonable jury could find that

he was a supervisor for purposes of imposing vicarious liability on Myron's.  See McGinest v. GTE Serv.

Corp., 360 F.3d 1103, 1119 n.13 (9th Cir. 2004) (distinction not dependent on job titles or formal

structures in workplace, but whether supervisor has authority to demand obedience from employee).

Defendant's motion is overruled on this issue.

Defendant argues that even if Harper is considered a supervisor, it is entitled to summary judgment

because as a matter of law, it has established an affirmative defense to vicarious liability under Faragher

v. City of Boca Raton, 524 U.S. 775 (1998).  In Faragher, the Supreme Court held:

> An employer is subject to vicarious liability to a victimized employee for an actionable
> hostile environment created by a supervisor with immediate (or successively higher)
> authority over the employee.  When no tangible employment action is taken, a defending
> employer may raise an affirmative defense to liability or damages, subject to proof by a
> preponderance of the evidence, see Fed. Rule. Civ. Proc. 8(c).  The defense comprises
> two necessary elements: (a) that the employer exercised reasonable care to prevent and
> correct promptly any sexually harassing behavior, and (b) that the plaintiff employee
> unreasonably failed to take advantage of any preventive or corrective opportunities
> provided by the employer or to avoid harm otherwise.  While proof that an employer had
> promulgated an antiharassment policy with complaint procedure is not necessary in every
> instance as a matter of law, the need for a stated policy suitable to the employment
> circumstances may appropriately be addressed in any case when litigating the first element
> of the defense.  And while proof that an employee failed to fulfill the corresponding
> obligation of reasonable care to avoid harm is not limited to showing an unreasonable
> failure to use any complaint procedure provided by the employer, a demonstration of such
> failure will normally suffice to satisfy the employer's burden under the second element of
> the defense.  No affirmative defense is available, however, when the supervisor's
> harassment culminates in a tangible employment action, such as discharge, demotion, or
> undesirable reassignment.

Faragher, 524 U.S. at 807-08.

-19-

Plaintiff concedes that Harper's harassment did not result in a tangible employment action. Therefore, to prevail on its defense, defendant must show that (1) it took reasonable care, as evidenced by its antiharassment policy, to prevent and correct promptly any sexually harassing behavior; and (2) plaintiff unreasonably failed to utilize the antiharassment policy. Mallinson-Montague v. Pocrnick, 224 F.3d 1224, 1228 (10th Cir. 2000).

Defendant argues that it is entitled to summary judgment because it had a reasonable policy on sex discrimination and plaintiff did not take advantage of the policy. As explained above, plaintiff has presented evidence that in June of 2002, Sigler told plaintiff that she was more replaceable than Harper, that he would not fire Harper and that if she continued to complain, he would have to let her go. Accordingly, at this stage, defendant has not established as a matter of law the elements of an affirmative defense under Faragher. The Court overrules defendant's motion for summary judgment on plaintiff's sexual harassment claim based on vicarious liability.

E.    Timeliness Of Plaintiff's EEOC Charge

Defendant argues that any claim for hostile work environment based on allegations of conduct before January 18, 2003 is barred because it occurred more than 300 days before plaintiff filed her EEOC charge. Title VII requires plaintiff to file an EEOC charge within 300 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1). Plaintiff filed her EEOC charge on November 14, 2003. Thus, the charge was timely with respect to unlawful employment practices which occurred within 300 days, or after January 18, 2003.

In National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the United States Supreme Court found that with respect to discrete retaliatory or discriminatory acts such as termination, denial of

transfer, failure to promote or refusal to hire, Title VII requires plaintiff to file an EEOC charge within 300 days of the date on which the act occurred.  Id. at 110, 114.  The Supreme Court distinguished hostile work environment claims, however, noting that their very nature involves repeated conduct. See id. at 115. Regarding hostile work environment claims, the Court stated:

> The "unlawful employment practice" therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

Id. at 115.  The Supreme Court concluded that an EEOC charge which alleges hostile work environment is timely "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [300-day] time period."  Id. at 122.  Morgan noted that with respect to hostile work environment claims, acts which occur outside the 300 days are considered timely unless (1) they are not related to acts within the 300 days or (2) they are no longer part of the same hostile environment claim due to "intervening action" by the employer.  Id. at 118.

Defendant first argues that its discipline of Harper in June of 2002 constitutes an "intervening action" so that plaintiff cannot assert a claim for conduct before that date.  Morgan did not discuss what type of conduct constitutes "intervening action."  In Watson v. Blue Circle, Inc., 324 F.3d 1252 (11th Cir. 2003), the Eleventh Circuit Court of Appeals found that prompt action by the employer to effectively resolve harassment by a specific individual constitutes "intervening action" which renders previous conduct by that individual no longer part of same hostile work environment claim.  Id. at 1258-59; see also Randall v. Potter, 366 F. Supp.2d 104, 118 (D. Me. 2005) ("intervening action" where plaintiff was placed on different crew than three alleged harassers, employer transferred or disciplined two alleged harassers and third harasser quit).  Here, viewing the evidence in the light most favorable to plaintiff, a reasonable jury

-21-

could find that despite a two or three month break in Harper's conduct, the written warning to Harper in June of 2002 did not effectively terminate his harassment of plaintiff.  A jury could also reasonably find that plaintiff suffered the same type of harassment by Harper both before and after June of 2002.  See Morgan, 536 U.S. at 120 (alleged events comprise same hostile environment where pre- and post-limitations period incidents involve same type of employment actions, occurred relatively frequently, and were perpetrated by same managers); Fernandez v. Hy-Vee, Inc., 158 F. Supp.2d 1253, 1267 (D. Kan. 2001) (five-month gap in employment did not preclude continuing violation doctrine where frequency and subject matter of alleged harassment were identical during both employment periods).  The Court therefore overrules defendant's motion for summary judgment based on Harper's conduct which occurred before June of 2002.

Defendant also argues that plaintiff cannot show a "reliable event" of sexual harassment within 300 days of her EEOC charge.  As explained above, several employees and former employees have partially corroborated plaintiff's version of events.  On a motion for summary judgment, the Court cannot weigh the evidence and determine witness credibility.  Based on the evidence outlined above, a reasonable jury could find that defendant subjected plaintiff to a hostile work environment within 300 days of her EEOC charge.  Accordingly, defendant's motion based on the timeliness of plaintiff's EEOC charge is overruled.

## II.    Retaliation

Plaintiff alleges that after she complained about sexual harassment to Cooney in August of 2003, defendant retaliated by terminating her employment.  In order to establish a prima facie case of retaliation under Title VII, plaintiff must show that (1) she engaged in protected opposition to Title VII discrimination;

(2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation; and (3) a casual connection links the protected activity and the adverse employment action.  See Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1263 (10th Cir. 1998), cert. denied, 526 U.S. 1039 (1999); Thomas v. Denny's, Inc., 111 F.3d 1506, 1513 (10th Cir.), cert. denied, 522 U.S. 1028 (1997).  Plaintiff can establish the causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982).

Defendant argues that it is entitled to summary judgment on plaintiff's retaliation claim because plaintiff did not engage in "protected activity," plaintiff cannot show a causal connection between her alleged protected activity and her termination, and plaintiff cannot show that defendant's offered reason for her termination is pretextual.

A.    Protected Activity

Defendant argues that plaintiff did not engage in "protected activity" before it terminated her employment on September 10, 2003.  On August 11, 2003, plaintiff told Cooney that Harper was calling her a fucking bitch and that she felt that she had suffered a hostile work environment since June of 2002. Informal complaints to superiors constitute protected activity.  See O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1255 (10th Cir. 2001); Pastran v. K-Mart, Corp., 210 F.3d 1201, 1205 (10th Cir. 2000); Robbins v. Jefferson County Sch. Dist. R-1, 186 F.3d 1253, 1258 (10th Cir. 1999). A jury could reasonably find that plaintiff engaged in protected activity.

B.    Causal Connection

Defendant argues that plaintiff cannot satisfy her burden to show a causal connection between her

-23-

protected activity and her termination.  The Tenth Circuit has held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation.  See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).  Here, plaintiff alleges that she complained on August 11, 2003 and was terminated on September 10, 2003.  For purposes of plaintiff's prima facie case, this temporal proximity is sufficient to defeat defendant's motion for summary judgment.  See id.

      C.      Pretext

After plaintiff establishes a prima facie case of retaliation, the burden shifts to defendant to offer a legitimate reason for the adverse action.  Here, defendant claims that it terminated plaintiff's employment because (1) she did not want to work there anymore, (2) she had difficulty communicating with others, (3) she allowed priority cases to sit and (4) she had a disruptive attitude such as interrupting the meeting between Cooney and Taylor.  The burden now shifts to plaintiff to show a genuine dispute of material fact whether defendant's proffered reasons are pretextual.  See Conner v. Schnuck Mkts., Inc., 121 F.3d 1390, 1394 (10th Cir. 1997).  Plaintiff may establish retaliation indirectly, by demonstrating that defendant's stated reasons are unworthy of belief.  See id. (citing Murray v. City of Sapulpa, 45 F.3d 1417, 1421 (10th Cir. 1995)).

Defendant argues that other than temporal proximity, plaintiff cannot show that defendant's stated reason for termination is a pretext for retaliation.  Sigler, who made the decision to terminate plaintiff's employment, testified that he relied only on the first of defendant's stated reasons, i.e. plaintiff did not want to work at Myron's anymore.  Viewing the evidence in the light most favorable to plaintiff, however, plaintiff informed defendant that she did not want to work at Myron's because it was not protecting her from sexual harassment.  Moreover, defendant terminated plaintiff approximately one month after she

-24-

complained to Cooney about Harper.  Finally, in June of 2002, the only time plaintiff complained to Sigler, he told plaintiff that she was more replaceable than Harper, that he would not fire Harper and that if she continued to complain, he would have to let her go.  In these circumstances, a jury could obviously find that defendant's stated reason for terminating plaintiff's employment is pretextual.  The Court therefore overrules defendant's motion for summary judgment on plaintiff's retaliation claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #62) filed April 6, 2005 be and hereby is **OVERRULED**.

Dated this 14th day of July, 2005 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge